UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                Plaintiff,

       v.                               06 Civ. _____ (\_\_\_)

VILLAGE OF PORT CHESTER,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ANDREW A. BEVERIDGE, PhD.

ANDREW A. BEVERIDGE, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1. I am Professor of Sociology at Queens College and the Graduate Center, City University of New York and Chair of the Queens College Sociology Department.. I respectfully submit this declaration in support of the motion by the United States for a preliminary injunction to require Port Chester to hold its Board of Trustees election pursuant to a district plan containing six districts (the "District Plan"). The proposed District Plan is attached as Exhibit A.

2. My primary responsibilities at the college and Graduate Center are teaching statistics and research methods at the graduate and undergraduate levels and conducting quantitative, statistically based social research. Trained at Yale University, I have been employed in such a capacity since 1973, first at Columbia University until 1981 and since then at Queens College and the Graduate Center of CUNY. My areas of expertise include demography and the statistical and quantitative analysis of social science data sets, including Census data, survey data and administrative records. I have published results and analyses from my research in many articles, which are noted on my résumé (Attached as Exhibit B.) Some of these results

and analyses served as the basis of widely read articles in the *New York Times*, where I serve as a demographic consultant through an agreement between the CUNY Research Foundation and the *Times*. In addition, I publish a regular column on demographic topics in the *Gotham Gazette*, an on-line publication of the Citizens Union Foundation. I have served as a consultant to a number of public and private entities, where I provided services related to demographic analysis and statistical, including districting and redistricting. For instance, under contract to the Yonkers City Council, I assisted Yonkers in redistricting and creating new Election District lines.

3. I have been provided expert demographic and statistical analysis in numerous cases, including the following: *New Rochelle Voters Rights Defense Fund v. City of New Rochelle* (Report and Testimony, 2003, cited in the opinion); *Montano v. Suffolk County Legislature* (Declaration and Testimony, 2003, cited in opinion); *Rodriquez v. Pataki* (Declaration, Report, and Deposition and Trial Testimony, 2002-2003); *Goosby v. Town Board of Hempstead* (Report and Testimony, 1995-96, Cited in District Court and 2nd Circuit Opinion); *Coalition for Fair Representation, et al v. City of Bridgeport, et al* (Affidavit, 1994, Cited in 2nd Circuit Decision); *People v. Taylor* (Affidavit and Testified at Trial 2002); *Walton v. City of Long Beach* (Testified at trial, 2000); *Village of Spring Valley v. Town of Clarkstown*, (Testified at trial, 2000); *United States v. Rudolph Weaver,* (Testified at trial, 2000, cited in 3rd Circuit Opinion); *New York City Environmental Justice Alliance, et al v., Rudolph W. Giuliani, et al* (Affidavit, 1999, Cited in the 2nd Circuit opinion); *Open Housing Center, Inc. v. Kings Highway Realty, a Division of Provenz Realty Corp.; Provenz Realty Corp; Diane Provenz; Evelyn Cannon; and Barbara Noonan* (Affidavit. Cited in Opinion, 1996); *New York State v. Gordon* (Affidavit, 1997); *New York State v. Hale,* 1996-1997 (Affidavit, 1996-1997); *New York State v. Chin,* (Affidavit, 1997); *Lachica v. Emergency Medical Services,* (Report, 1996.); *United States v. Jose Reyes, et al,* (Report and Testimony, 1996, Cited in District Court Opinion); and *Garrison v. I.R.S., 1991-1992*. (Report and Testimony, 1992). All cases and testimony are catalogued in my résumé attached as Exhibit B.

4. I have been asked to determine whether Hispanic voters are sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Board of Trustees can be drawn in which they would constitute an effective majority in one or more of six districts. To carry out this analysis, I reviewed various materials pertaining to both the Village elections in Port Chester and the demography of the village. These materials included the following:

a. Data from the United States Bureau of the Census, which provided information on the racial composition and ethnic status of the total and voting age population for each Census Block for 1990 and 2000;

b. A computerized map of all Census blocks in Port Chester in 1990 and 2000, including population and racial composition for each block, and computerized maps of election districts (EDs) and census-created voting tabulation districts (VTDs).

c. A special tabulation done by the Census Bureau for Election Data Services (STP76), but now publicly available. This tabulation provides information to the block group level about race and Hispanic status, citizenship and voting age.

d. A newly prepared list of 639 Hispanic Surnames provided by the Census Bureau, and a paper describing the list: "Building a Spanish Surname List for the 1990s: New Approach to an Old Problem," which is available at this URL: http://www.census.gov/population/documentation/twpno13.pdf. This list enables one to estimate the number and percent of Hispanics on a voter list.

e. A Census Estimates of the population by age, race, sex and Hispanic status in Westchester County July 2005, the most recent year available.

f. Other information about geographic features of Port Chester, including the location of streets, water, village boundaries and the like.

g. Voter Lists for Port Chester for 2001 and for 2006.

All of these materials were in a GIS system (*Maptitude for Redistricting*) that has been commonly used throughout the United States for this round of redistricting. In addition, I reviewed:

   a. Electoral returns by precinct for Village elections from 1995 through 2006. These included the Mayor, who has a three year term, and the six trustees elected at large, who have three year staggered terms, with two elected each year.

   b. Voter poll lists and voter registration lists for the Village of Port Chester. The Village administers its own elections, but uses materials and voter registration lists provided by the Westchester Board of Elections.

To carry out my analyses I used a Geographical Information System (GIS) (*Maptitude for Redistricting*), as well as a variety of statistical and other software, including *SAS* (version 8.2) and *EXCEL*.

   5. According to the United States Census, from 1990 to 2000 the population of Port Chester changed dramatically. The population increased from 24,728 to 27,867 or 12.69 percent.

   6. The Latino population increased from 7,446 to 12,884 or 73.03 percent.

   7. The Non-Hispanic white population decreased from 14,461 to 11,934 or 17.47 percent.

   8. Because of all of these changes, Port Chester in 2000 was 46.23 percent Hispanic, 42.82 percent Non-Hispanic White, 6.61 percent Non-Hispanic Black (Various population breakdowns and changes are presented in Exhibit C (Table 1).) In short, the proportion of Hispanics is increasing in Port Chester. By all indications this trend continues to the present day.

   9. In 2000, Port Chester had 21,600 residents of voting age according to the PL94-171 data, which are official redistricting census figures. These figures are based upon the complete count data, which use the "short form" and have age, race, and Hispanic status, and

age.

10. The Census Bureau also provides data from the "long form," which is filled out by a large sample of households. The long form data include information on citizenship status. The usual Census Bureau products, however, do not include data that give a tabulation of citizenship, by voting age, and Hispanic status and race.

11. However, after the 2000 Census a number of groups and individuals contracted with the Census Bureau to tabulate such information. A special census tabulation (STP76) is available which provides voting age citizenship data in 2000. These data are rounded to 5 and are provided at the block group level, as well as at the tract level, the minor civil division level, the place level and the county level for the United States. Since these data are rounded and derived from a survey, they are subject to sampling and other error. Nonetheless, they do provide a reasonable measure of citizenship among various groups in the voting age population.

12. According to this tabulation, as of the 2000 Census Port Chester had 13,990 citizens of voting age. The rounded tabulation reports the total voting age population to be 21,585 almost identical to that found in the complete count. Thus only about 65 percent of all voting age residents of Port Chester were citizens and therefore eligible to vote. Of these citizens of voting age, 65.5 percent were Non-Hispanic White, 21.9 percent were Hispanic and 8.9 percent were Non-Hispanic Black. (The composition of the voting age population and the citizen voting age population is shown in Exhibit D (Table 2).)

13. Census estimates and the changing composition of the rolls of registered voters indicate that the proportion of Hispanics of voting age in Port Chester continues to grow. Using the changing composition of the voter list in Port Chester combined with an assumption that the proportion of African Americans and Hispanics changed in proportion to the non-Hispanic change in the rolls of registered voters, I was able to make an estimate of the voting age population in Port Chester in 2006. To do this, I assumed that change in the Hispanic citizen voting age population and the non-Hispanic citizen voting age population were directly related to

the change in the Hispanic and the non-Hispanic names on the rolls of registered voters. Thus the percent that Hispanics increased based upon the rolls of registered voters (using the surname analysis procedure) was assumed to be the same as the percent that they increased in the citizen of voting age population.

14. When one considers citizen of voting age population for all of Port Chester the figures as of July 2006 are 27.5 percent Hispanic, 61.0 percent Non-Hispanic white and 8.0 percent Non-Hispanic black. (These figures also are presented in Exhibit D (Table 2).)

15. In my opinion, because of the concentration of Hispanic population in Port Chester, a single-member districting plan can be created that includes one majority Hispanic district (District 4). Such a plan follows accepted districting principles. The concentration of the citizen of voting age Hispanic population is shown in the District Plan (Exhibit A), along with one such proposed districting plan.

16. Another map attached to this declaration details exactly which portions of Port Chester would be placed in each district using the proposed plan, along with the boundaries of the proposed districts is shown in Exhibit E (Map 2).

17. As of the 2000 Census, 50.5 percent of the citizens of voting age in District 4 were Hispanic. Based upon the estimates presented above, as of July 2006 the proportion of Hispanic citizens of voting age in District 4 has increased to 61.3 percent. See Exhibit F (Table 3).

18. In short, a districting plan exists for Port Chester, which creates six single-member districts, where at least one district has a large majority of Hispanic voting age citizens.

19. The foregoing is based upon the materials noted and relies upon my qualifications as a demographer and social scientist.

I declare under penalty of perjury that the foregoing is true and correct. To the extent the foregoing states my opinion; it is a true and accurate statement of my opinion.

Dated: Yonkers, New York
December 14, 2006

_____
ANDREW A. BEVERIDGE