# PRELIMINARY REPORT

## of

## Peter A. Morrison, Ph.D.

## for the case of
## *United States v. Village of Port Chester*

**DRAFT: Revised January 20, 2007**

# CONTENTS

**SECTION**                                                                **PAGE**

SUMMARY                                                                      3

I.      INTRODUCTION                                                         5

II.     HOW THE HISPANIC AND WHITE NON-HISPANIC POPULATIONS
        DIFFER DEMOGRAPHICALLY                                               6

III.    SOCIOECONOMIC INFLUENCES ON POLITICAL PARTICIPATION
        AMONG ALL GROUPS IN THE POPULATION                                  10
        1.  Adult Age Composition                                           10
        2.  Educational Attainment                                          11
        3.  Household Income                                                13
        4.  Length of Residence                                            14
        5.  Longevity in the United States                                  14
        6.  English Language Fluency                                        14
        7.  Naturalization Status                                           14

IV.     DIFFERENCES IN POLITICAL PARTICIPATION LEVELS RESULTING
        FROM DEMOGRAPHIC AND SOCIOECONOMIC FACTORS                          16
        Measures of Political Participation                                 16
        Observed Levels of Hispanic Political Participation                 17

V.      INDICATORS OF AN EFFECTIVE VOTING MAJORITY                          18
        Voter Registration and Turnout                                      18
        Candidates' Order of Finish in Recent Elections                     20

VI.     CRITICAL EVALUATION OF PLAINTIFF'S PLAN A                           26
        Consequences of Using Plan A                                        26
        Devaluation of Votes                                                29
        Other Consequences                                                  30

VII.    CONCLUSIONS                                                         31

        REFERENCES                                                          32

# SUMMARY

This report analyzes the resident population of the Village of Port Chester, NY. It identifies and analyzes demographic and socioeconomic factors wholly independent of race or ethnicity that affect the political participation of Hispanics and non-Hispanics in the Village. It also evaluates Plaintiff's assertion that the Hispanic population of Port Chester is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Village Board of Trustees can be drawn in which Hispanics would constitute an effective majority in one of six districts. The analysis has been prepared at the request of attorneys for the defendant in *United States v. Village of Port Chester, NY*. My major findings and conclusions are:

1. <u>Demographic differences between Hispanic and white non-Hispanic populations result in comparatively lower levels of voter registration and turnout among Hispanics.</u> The two populations differ markedly in terms of two demographic factors that determine eligibility to register and vote: age composition and citizenship. Hispanics comprise 46% of Port Chester's total population; however, they are only 22% of the population of citizens 18 and older who are eligible to vote. These disparities between Hispanics' numerical presence in the population and their inherent electoral strength are the product of demographic differences between two populations, not Hispanic ethnicity *per se.*

2. <u>Socioeconomic differences between Hispanics and non-Hispanics magnify these inherent disparities, blunting Hispanic registration and voter turnout in Port Chester.</u> The Hispanic adult population is heavily weighted with persons who are youthful, have completed fewer years of schooling, are less fluent in English, have immigrated only recently, and are members of households with lower incomes and short durations of residence. This confluence of multiple factors has the overall effect of blunting Hispanics' political participation generally. Together, these factors predispose lower levels of registration and voter turnout by Hispanics than non-Hispanics, again for reasons unrelated to Hispanic ethnicity *per se.*

3. <u>These limits on political participation are not inherently racial or ethnic.</u> Any population would register and turn out to vote at substantially lower rates if its demographic and socioeconomic profile differed as much from other population groups as Hispanics do in Port Chester. The demographic differences in citizenship and age composition alone account for most of the apparent disparity in the rate at which Hispanics and non-Hispanics register to vote.

4. <u>Hispanics do not constitute an effective majority in any district of Plaintiff's Plan A.</u> Even if Hispanics are a bare majority of the citizen voting-age population any district, they are demonstrably far less than a majority among the *registered voters* of that district. This demonstrable fact means that Plaintiff cannot satisfy the Gingles first precondition.

5. <u>Plaintiff's Plan A violates traditional redistricting criteria for drawing a fair and balanced plan.</u> Its design manifests Plaintiff's predominant emphasis on race in order to form a district where Hispanics are the majority of voting-age citizens. This predominant emphasis on race subordinates other legitimate traditional redistricting criteria, with consequences that render Plan

A unfair and improper. First, Plaintiff's predominant emphasis on race causes the votes of <u>individual electors</u> in certain districts to be grossly devalued. Second, this devaluation of votes will systematically penalize existing <u>communities of interest</u> within Port Chester. Third, by "packing" noncitizens in one of the six districts to create a Hispanic majority there, Plaintiffs necessarily "pack" Anglos into one or more of the other five districts, even though Anglos have sufficient voting-age citizens to be the majority in all six districts. The effect here is to maximize the voting strength of one group (Hispanics) at the expense of another group (non-Hispanic whites).

The following sections present the analyses supporting these conclusions. First, I consider the demographic and socioeconomic differences that limit the pool of eligible Hispanic voters and predispose lower political participation among those who are registered to vote. Next, I show how these limitations are manifested in differing levels of registration and voter turnout among Hispanics and non-Hispanics. Lastly, I offer a critical evaluation of Plaintiff's Plan A.

5

## I.    **<u>INTRODUCTION</u>**

This report analyzes the resident population of the Village of Port Chester, NY. It identifies and analyzes demographic and socioeconomic factors wholly independent of race or ethnicity that affect the political participation of Hispanics and non-Hispanics in the Village. It also evaluates Plaintiff's assertion that the Hispanic population of Port Chester is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Village Board of Trustees can be drawn in which Hispanics would constitute an effective majority in one of six districts. The analysis has been prepared at the request of attorneys for the defendant in *United States v. Village of Port Chester, NY.*

## II.  HOW THE HISPANIC AND NON-HISPANIC POPULATIONS DIFFER DEMOGRAPHICALLY

Since at least 1990, Hispanic persons have been a rapidly growing presence in the Village of Port Chester.  However, pronounced demographic differences between the Hispanic and white non-Hispanic populations now blunt Hispanics' registration and voter turnout relative to the corresponding non-Hispanic levels of participation.  Proportionally fewer Hispanics than white non-Hispanics are old enough to vote; and proportionally fewer Hispanic voting-age persons are citizens.

These two demographic factors alone narrow Hispanics' inherent political presence relative to their sheer numbers in the population.  The pool of eligible voters within the Hispanic population is smaller than it is within the white non-Hispanic population.  Consistent with these demographic realities, current data reveal that:

- Hispanics constitute 46% of the village's total population but only 22% of the voting-age citizens eligible to vote as of 2000, based on the decennial census.

- Hispanics are only 21% of person currently registered to vote (which is the percentage of registered voters with Spanish surnames as of November 2006).

- Hispanics are an even smaller percentage (18% Spanish-surnamed) of those persons voting in the November 2006 general election.  See Fig. 1 (at page 0).

As in other American cities (Clark and Morrison, 1995; Morrison, 1998), such disparities have arisen over time through an influx of foreign-born persons from Mexico and Central and South America.

In 1990, the population of Port Chester numbered 24,728, of whom 7,446 (30%) were Hispanic (see Table 1 at page 8, top panel).  Demographic differences among major population groups were apparent in 1990.  The percentage of persons old enough to vote was noticeably lower among Hispanics (75.4%) than among non-Hispanics (82.0%).



Figure 1—Current Population and Electorate of Port Chester Village

**Table 1. DEMOGRAPHIC DIFFERENCES AMONG GROUPS WITHIN THE POPULATION OF PORT CHESTER VILLAGE: 1990 AND 2000**

| Group | Total population | Percentage of total population: | |
|---|---|---|---|
| | | 18 + | Citizens 18 + |
| *1990* | | | |
| All groups | 24,728 | 80.0% | 61.0% |
| Hispanics | 7,446 | 75.4% | < 61% |
| Non-Hispanics (all races) | 17,282 | 82.0% | > 61% |
| White non-Hispanics | 14,461 | -- | -- |
| *2000* | | | |
| All groups | 27,867 | 77.5% | 50.2% |
| Hispanics | 12,884 | 72.7% | 23.7% |
| Non-Hispanics (all races) | 14,983 | 81.7% | 73.2% |
| White (alone) non-Hispanic | 11,934 | 83.7% | 78.2% |
| Sources: 1990 Census, STF1 Table DP1 and STF3 Tables P36, P37; 2000 Census, SF2 Table DP1 and Voting Rights Special Tabulation VROUTFSJC.TXT. | | | |

Table 1 also shows how the eligibility barrier of noncitizenship compounds these age structure effects. According to the 1990 census, voting-age *persons* comprised 80% of the total population; however, voting-age *citizens* comprised only 61%. The difference here stems from the fact that 24% of Port Chester's voting-age population were not citizens, hence ineligible to vote. Data presently available do not show these percentages separately for Hispanics as of 1990. However, it is a virtual certainty that less than 61% of all Hispanics were citizens 18 and older in 1990.

Among Port Chester's 24,728 inhabitants in 1990, the census reports 8,047 as foreign-born persons. Over half (4,509) had entered the U. S. within the past 10 years; one in four (1,951) were very recent arrivals, having entered the U. S. within just the preceding three years.

Over the next decade, the population of Port Chester registered a net increase of 3,139 persons. Hispanics, though, became far more numerous, increasing by 5,438 (see Table 1, bottom vs. top panels). As Hispanics displaced non-Hispanics in Port Chester, the Hispanic share in the population expanded. By 2000, Port Chester had become a village of 27,867 inhabitants, 46% of whom were Hispanic. The demographic disparity that was apparent in 1990 between Hispanics' numerical presence (their share of the total population) and their effective political presence

(their share of the eligible citizen voting-age population) had widened by 2000.

The bottom panel of Table 1 documents this present-day disparity. Just 23.7% of Port Chester's 12,884 Hispanics (all ages) are voting-age citizens eligible to vote; the rest (76.3%) are noncitizens or not yet of voting age.[1] Among non-Hispanics, by comparison, the corresponding percentage is 73.2%; and the overall citywide percentage is 50.2%.

Port Chester's Hispanic population is varied in its origins. Mexicans makes up 24% of the village's Hispanic residents. Ecuadorians make up another 11%. Guatemalans comprise a further 8%; Peruvians and Puerto Ricans each comprise 7%; and Colombians, Salvadorans, and Cubans each comprise 4% to 5%. The rest are from assorted other origins (mostly other Central and South American countries).

By 2000, according to census data, Port Chester's foreign-born population had swelled from 8,047 in 1990 to 11,535 persons (or two-fifths of the population). As of 2000, 6,003 of these were *recent* immigrants, having entered the U. S. since 1990. Census 2000 data offer a revealing profile of these 6,003 recent immigrants joining Port Chester's population since 1990.

- 4,993 (over four-fifths) are Hispanic persons, a number that accounts for nine-tenths of the 5,438-person increase in Hispanics since 1990.

- Fully 4,729 (95%) of these 4,993 Hispanic recent immigrants are noncitizens.

Clearly, the 1990s witnessed a substantial influx of Hispanics who were not yet naturalized citizens as of 2000. Although these newcomers are not distinguished by age, there can be no doubt that this influx added many thousands of Hispanics to Port Chester's existing adult population. The 95% figure immediately above is highly revealing: It means that 19 out of 20 of these additional Hispanics are ineligible to vote because they are noncitizens. They will remain ineligible until they eventually naturalize. Clearly, their addition to Port Chester's adult population partially accounts for the disparity apparent in Fig. 1 (at page 0) between Hispanics' numerical presence in the village's population (46%) and their intrinsic political presence as indicated by their share of the population eligible to vote (22%).

To naturalize, an immigrant must fulfill certain requirements, one of which is to have resided in the U. S. continuously for at least 5 years following lawful admission as a permanent resident. Typically, the number of years of residence between the date of legal permanent residence and the subsequent date of naturalization has averaged 9 years.[2] This nine-year lag implies that any naturalizations of the 4,729 Hispanic noncitizens who moved to Port Chester between 1990 and 2000 will likely be concentrated between 1999 and 2008. The process of naturalization may well have lengthened after September 11, 2001, although I have no firm data to document that it has.

---

[1] Among Port Chester's Hispanics 18 and older on the 2000 Census, just 33% are citizens (compared with 89% of non-Hispanics).

[2] **UPDATE** Reference here is to aliens who naturalized in 2001, the latest year for which data presently are available. Source: *2001 Statistical Yearbook of the Immigration and Naturalization Service* (forthcoming), accessed 2/28/03 at www.immigration.gov/graphics/aboutins/statistics/

## III. <u>SOCIOECONOMIC INFLUENCES ON POLITICAL PARTICIPATION AMONG ALL GROUPS IN THE POPULATION</u>

Thus far, we have seen that barriers of citizenship and age substantially blunt Hispanics' eligibility to register and vote. The manifestations of those barriers are apparent in Figure 1 and Table 1. Such limits on political participation arise wherever two populations differ from each other in ways that narrow the pool of eligible voters. The limits are not inherently racial or ethnic.

Apart from these demographic barriers, other nonracial/ethnic socioeconomic factors influence political participation. They, too, manifest themselves wherever two populations differ from each other, irrespective of ethnicity or race.

Academic research identifies several specific socioeconomic factors that predispose lower political participation within any segment of the population.[3] The most consistently influential ones are: (1) adult age composition, (2) educational attainment, (3) income, and (4) length of residence. Among foreign-born persons, (5) longevity in the U. S., (6) English language fluency, and (7) naturalization status also are influential. On each of these factors, the socioeconomic profile of Hispanics, documented below, predisposes lower participation apart from ethnicity or race.

### 1. <u>ADULT AGE COMPOSITION.</u>
Political participation varies systematically by age. Typically, voters register and turn out at the lowest rates during early adulthood. Thereafter, participation rises with advancing age, plateaus in later adulthood, and declines in old age. This curvilinear relationship (net of other variables) is illustrated in Fig. 3 (at page 11).

This omnipresent age pattern has particular relevance for Hispanics in Port Chester (see Table 3 at page 00). Hispanic adults are concentrated disproportionately in their late teens and 20s (the politically least active ages). White non-Hispanics, by contrast, are disproportionately *older* adults above 50 (the politically most active ages). Among persons 18 and older in Port Chester:

- 38% of Hispanics are under age 30, compared with 17% of non-Hispanics (and 16% of white non-Hispanics);

- 46% of white non-Hispanics are 50 and older, compared with only 17% of Hispanics.

---

[3] See for example: Arvizu and Garcia (1996); Timpone (1998); Verba and Nie (1972); Wolfinger and Rosenstone (1980); Leighley and Nagler (1992); and Uhlaner et al. (1989). Calvo and Rosenstone (1989) has particular relevance here, since the authors examine voting and registration for the various national origin components of the Hispanic population, including Puerto Ricans.



Source: Timpone (1998), Fig. 1.

**Fig. 3—Influence of Age on Participation in the Full Electorate**

2.  <u>EDUCATIONAL ATTAINMENT</u>.  A substantial body of research cited above also establishes a strong and consistent link between a person's educational attainment and the propensity to register and vote.  Fig. 4 (at page 13) illustrates this relationship for Hispanics nationally, net of other socioeconomic variables.

**Table 3.  SOCIOECONOMIC DIFFERENCES BETWEEN HISPANICS AND NON-HISPANICS:  VILLAGE OF PORT CHESTER, 2000**

| Socioeconomic Indicator | Population group | | |
|---|---|---|---|
| | Hispanic | All non-Hispanic | White non-Hispanic |
| *Age makeup (population 18+):* | | | |
| % under age 30 | 38% | 17% | 16% |
| % ages 50 + | 17% | 43% | 46% |
| *Educational attainment (ages 25+):* | | | |
| % completing less than 9th grade | 32% | 6% | 6% |
| % not completing high school | 52% | 17% | 15% |
| % with at least some college education | 23% | 50% | 51% |
| % with B.A. degree or higher | 8% | 29% | 29% |
| *Income (1999):* | | | |
| Median household income | $40,522 | $47,521 | $51,899 |
| Per capita family income | $12,862 | $28,314 | $31,161 |
| *Length of residence at current address:* | | | |
| % less than 15 months | 20% | 13% | 12% |
| % less than 5 years | 61% | 37% | 35% |
| *Longevity in the United States:* | | | |
| % who immigrated within last decade | 57% | 37% | 28% |
| % who immigrated within last 5 years | 31% | 19% | 17% |
| *Fluency in English (population 18+):* | | | |
| % unable to speak English well | 47% | 4% | 4% |
| *Naturalization status (citizen population):* | | | |
| % of voting-age citizens naturalized | 55% | 12% | 11% |

Sources:  Census 2000 SF1, SF2, SF3.



Years of Schooling

**Fig. 4--Effect of Education on Voter Turnout**

Source: Calvo and Rosenstone (1989), Fig. 3.

This omnipresent education pattern has particular relevance for Hispanics in Port Chester (see Table 3 at page 12). Hispanic adults as a whole have lower levels of educational attainment relative to white non-Hispanics--differences that strongly predispose lower levels of political participation among Hispanics. As of 2000, 32% of Hispanics 25 and older had less than a 9th grade education and 52% lacked a high school diploma (compared with 15% of white non-Hispanics). Only 23% of Hispanics had at least some college education, compared with 51% of white non-Hispanics; and only 8% of Hispanics had a bachelors degree or higher, compared with 29% of white non-Hispanics.

3. HOUSEHOLD AND FAMILY INCOME. A further well-documented link exists between income and a person's propensity to register and vote. This income pattern has relevance for Port Chester's Hispanic residents, whose median household income

($40,522) is comparatively low and per capita family income ($12,862) is less than half that of non-Hispanics (see Table 3 at page 12).

### 4.  LENGTH OF RESIDENCE

Research consistently shows an association between time at current residence and political participation (Arvizu and Garcia, 1996: p. 122; Avey, 1989).  More precisely, "[T]hose who have been at their current address for five years or more have odds of registering and voting that are almost twice as high as those at their current residence for less than one year." (Bass and Casper, 2001: p. 495.)

This association partly reflects the need to re-register after each change in residence, a known stumbling block en route to the polls (Squire, Wolfinger, and Glass, 1987, p.45; Highton, 2000).  In this regard, most Hispanics in Port Chester have a comparatively short length of residence at current address compared with their non-Hispanic counterparts (see Table 3 at page 12).  One in five has lived at the current address for less than 15 months, and three in five moved in within just the past five years—percentages that far exceed their non-Hispanic counterparts.

### 5.  LONGEVITY IN THE UNITED STATES.

Longevity in the U. S. is a further distinct influence.  Among immigrants, the odds of registering and voting tend to be higher for those who have been in the U. S. for longer periods of time (Bass and Casper, 2001: p. 502).  Hispanics immigrants have less longevity in the U. S. (see Table 3).

In terms of both length of residence and longevity in the U. S., then, each of the Census 2000 indicators in Table 3 documents a confluence of residence effects that predispose lower levels of registration and turnout among Hispanics than among others:

- 61% of Hispanic households have been at their current address for less than 5 years (vs. 35% of white non-Hispanic ones), and 20% of Hispanic households have moved in within just the past 15 months.

- The Hispanic population is heavily weighted with foreign-born persons who have entered the U. S. within only the past decade: 57% compared to only 28% among white non-Hispanics.

### 6.  ENGLISH LANGUAGE FLUENCY.

Academic research suggests that language can pose a barrier to effective political participation among Hispanics (Calvo and Rosenstone, 1989: pp. 22-23; Brischetto and de la Garza, 1983; Uhlaner et al., 1989).  Specifically, "The language barrier may make it difficult to register to vote, more difficult to understand what is going on in politics, and more difficult to make it to the polls on election day." (Calvo and Rosenstone, 1989: p. 23).  Here, too, the contrast between the two populations predisposes lower levels of registration and turnout among Hispanics than among others.  Proportionally more adult Hispanics (47%) than white non-Hispanics (4%) do not speak English well.

7. <u>NATURALIZATION STATUS</u>.  Still another factor predisposing lower political participation in Port Chester is the high percentage of *naturalized* (rather than native-born) citizens among Hispanics in Port Chester.  Nationally representative data show that the odds of registering are 36 percent lower--and the odds of voting 26 percent lower--among naturalized than among native-born citizens (Bass and Casper, 2001: p. 504).  Fully 55% of adult Hispanic citizens in Port Chester are *naturalized* citizen rather than citizens by birth (compared with 12% of their non-Hispanic counterparts).

In summary, the confluence of socioeconomic differences documented in Table 3 predisposes lower registration and turnout rates by Hispanic than non-Hispanic voting-age citizens in Port Chester.  The Hispanic population is heavily weighted with youthful adults, persons with fewer years of schooling, limited English fluency, and recent immigrants; persons who are naturalized rather than citizens by birth; persons in low-income households and families; and persons who are recent newcomers to the United States and to Port Chester.  Such differences are readily apparent in recent electoral data, to which I now turn.

## IV. DIFFERENCES IN POLITICAL PARTICIPATION LEVELS RESULTING FROM DEMOGRAPHIC AND SOCIOECONOMIC FACTORS

We have seen that multiple factors are known to blunt political participation, apart from ethnicity or race; and that there exists in Port Chester a confluence of these factors among the village's Hispanics. This confluence is bound to predispose lower levels of registration and voting by Hispanics than non-Hispanics, for reasons unrelated to Hispanic ethnicity *per se*. Any group in the population would register and turn out to vote at substantially lower rates if its demographic and socioeconomic profile differed as much from other groups as Hispanics do in Port Chester.

The next question is: How clearly discernible are these effects in Port Chester?  To answer that question, I have assembled the most salient data available showing registration and voting rates by Hispanics and non-Hispanics in Port Chester. The anticipated effects are apparent, as documented below.  Briefly, Hispanics register and turn out to vote at substantially lower rates than non-Hispanics, and the magnitude of the disparity correlates directly with the factors I have identified. These factors narrow the pool of eligible voters among Hispanic adults to a remarkable degree, and they blunt voter turnout among Hispanic registered voters.  Collectively, they would predispose lower turnout in any population (regardless of ethnicity) that is so heavily weighted with youthful adults, persons with fewer years of schooling, limited English fluency, and recent immigrants; persons who are naturalized rather than citizens by birth; and persons with low income levels and short durations of residence.

## MEASURES OF POLITICAL PARTICIPATION

I rely on the following indicators of political participation for the entire Village of Port Chester and within each of its 16 voting districts ("TWDs"):

- The estimated registration rate per 100 Hispanic and non-Hispanic persons of voting age as of 2006.  This rate is calculated as follows: (1) Hispanic: the number of Spanish-surnamed registrants as of November 2006 divided by the number of Hispanic persons of voting age as of 2000, expressed on a per-hundred basis. (2) Non-Hispanic: the number of nonSpanish-surnamed registrants as of November 2006 divided by the number of non-Hispanic persons of voting age as of 2000, expressed on a per-hundred basis.  "Estimated" denotes that the denominator is not confined to citizens.  Also shown is the percentage-point difference between Hispanic and non-Hispanic registration rates.

- The turnout rate at which Hispanic and non-Hispanic registrants voted in the November, 2006 general election and the annual March village elections since 1995.  This rate is calculated as the number of Spanish-surnamed (or, alternatively, nonSpanish-surnamed) voters in a given election divided by the number of Spanish-surnamed (or, alternatively, nonSpanish-surnamed) registrants when that election was held, expressed on a per-hundred basis.  Also shown is the percentage-point difference between Hispanic and non-Hispanic turnout rates.

## OBSERVED LEVELS OF HISPANIC POLITICAL PARTICIPATION

It is apparent that Hispanics in Port Chester register to vote at a much lower rate than non-Hispanics. On a village-wide basis, the percentage of adults registered to vote is substantially lower for Hispanics (23%) than non-Hispanics (67%).[4] The 44 percentage-point difference here between the two groups is attributable mostly to the demographic influences of citizenship and age composition (along with the confluence of other socioeconomic factors discussed above). Even on the basis of the *citizen* adult population, though, a noticeable 5 percentage-point gap remains: 69 % of Hispanic citizens registered to vote, compared with 75% on non-Hispanic citizen.

Moreover, Hispanic registrants turn out to vote at a lower rate than do non-Hispanic registrants. The percentage of registrants who turned out to vote also is substantially lower for Hispanics than non-Hispanics. To cite just the most recent elections:

- In the November 2006 general election, 37.2% of Hispanic registrants voted (compared with 44.5% of non-Hispanics);

- In the 2005 village election, 12% of Hispanic registrants voted (compared with 25% of non-Hispanics);

  In the 2004 village election, 9% of Hispanic registrants voted (compared with 20% of non-Hispanics).

The substantially lower levels of registration and turnout among Hispanics reflect the multiple factors known to blunt political participation in any group. Citizenship is far and away the most influential here, but the confluence of other demographic and socioeconomic influences documented above surely diminish Hispanic political participation even further.

In conclusion, there is a straightforward explanation of why Hispanics in Port Chester rarely elect a candidate of their choice under the existing at-large system. The explanation stems from a clear and obvious demographic reality: the comparatively few Hispanics who are eligible to vote are vastly outnumbered by the much larger number of non-Hispanics eligible to vote. Although Hispanics constituted 46% of the village's total population and 43% of voting-age persons in 2000, they were a mere 22% of its voting-age *citizens*. Consistent with that 22% share in 2000, Hispanics presently constitute just 18% of the actual voters in the most recent (November 2006) general election and an even smaller share (10% to 11%) of voters in recent village elections (see Fig. 1 at page 7).

Non-Hispanics strength in numbers (typically 82% to 90% of those voting) means that they usually determine the winners in such elections, and it is doubtful that a single-

---

[4] Calculated as 2,127 Spanish-surnamed registered voters in 2006 divided by 9,364 voting-age Hispanics in 2000; and 8,209 non-Spanish-surnamed registered voters in 2006 divided by 12,223 voting-age non-Hispanics in 2000.

member district (SMD) could change this reality.   For one thing, Hispanics have never constituted a majority of registered voters in *any* of the village's 16 voting districts. Indeed, the Hispanic share of registrants has never exceeded 45% of registrants in any voting district.  On that basis alone, it appears unlikely that Hispanics could be an effective majority in any SMD-member district that is part of a properly drawn six-district plan.

## V. <u>INDICATORS OF AN EFFECTIVE VOTING MAJORITY</u>

Hispanic voters' "ability to elect" in a single member district is a central issue here since it determines whether the Court can provide relief to the Plaintiffs. Accordingly, I have assembled data relevant to Hispanic political participation. First, I examine registration levels, both villagewide and within District 4 of Dr. Beveridge's Plan A, which are relevant evidence in determining whether Hispanics constitute an effective voting majority in District 4. Next I examine Hispanics' share among voters turning out in village trustee elections since 1995.

Briefly, the data underscore two points. First, Hispanics do not presently comprise a majority of the registered voters in District 4. Second, Hispanics have never comprised a majority of District 4 voters turning out in any election since 1995.

### <u>VOTER REGISTRATION AND TURNOUT</u>

Table V-1 presents villagewide registration and voter levels for the most recent (November 2006) general election. Of the Village's 10,336 registrants, 2,127 (20.6%) are presumptively Hispanic (Spanish surnamed). Of the 4,442 voters who turned out in the November 2006 election, only 791 (17.8%) are Hispanic. Thus, Hispanics' share among voters trails their share among registrants by nearly three percentage points. The voter turnout rate among Hispanics (37.2 per hundred registrants) trails the corresponding turnout rate among non-Hispanics (44.5 per hundred) by more than seven percentage points.

20

Table V-1

| November 2006 General Election Registration and Turnout, Port Chester, NY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Registrants 2006 | | | Voters 2006 | | | Voter Turnout Rate 2006 | | |
| TWD | Total | SSN | % SSN | Total | SSN | % SSN | Total | SSN | Non-SSN |
| 5 | 520 | 177 | 34.04% | 196 | 60 | 30.61% | 37.7% | 33.9% | 39.7% |
| 6 | 573 | 136 | 23.73% | 199 | 50 | 25.13% | 34.7% | 36.8% | 34.1% |
| 7 | 253 | 93 | 36.76% | 85 | 30 | 35.29% | 33.6% | 32.3% | 34.4% |
| 8 | 425 | 176 | 41.41% | 145 | 51 | 35.17% | 34.1% | 29.0% | 37.8% |
| 9 | 571 | 146 | 25.57% | 232 | 54 | 23.28% | 40.6% | 37.0% | 41.9% |
| 10 | 613 | 131 | 21.37% | 267 | 54 | 20.22% | 43.6% | 41.2% | 44.2% |
| 11 | 608 | 112 | 18.42% | 257 | 44 | 17.12% | 42.3% | 39.3% | 42.9% |
| 12 | 735 | 92 | 12.52% | 356 | 34 | 9.55% | 48.4% | 37.0% | 50.1% |
| 13 | 893 | 152 | 17.02% | 417 | 67 | 16.07% | 46.7% | 44.1% | 47.2% |
| 14 | 662 | 169 | 25.53% | 279 | 69 | 24.73% | 42.1% | 40.8% | 42.6% |
| 15 | 382 | 154 | 40.31% | 112 | 45 | 40.18% | 29.3% | 29.2% | 29.4% |
| 16 | 967 | 225 | 23.27% | 449 | 102 | 22.72% | 46.4% | 45.3% | 46.8% |
| 17 | 702 | 222 | 31.62% | 291 | 76 | 26.12% | 41.5% | 34.2% | 44.8% |
| 18 | 849 | 66 | 7.77% | 377 | 26 | 6.90% | 44.4% | 39.4% | 44.8% |
| 19 | 768 | 43 | 5.60% | 374 | 17 | 4.55% | 48.7% | 39.5% | 49.2% |
| 25 | 815 | 33 | 4.05% | 406 | 12 | 2.96% | 49.8% | 36.4% | 50.4% |
| Totals | 10,336 | 2,127 | 20.58% | 4,442 | 791 | 17.81% | 43.0% | 37.2% | 44.5% |

Source: File 12190676 furnished by Westchester County Board of Elections to Peter Morrison.  Surnames coded against Census Bureau List of Spanish Surnames.

Table V-2

| NOV. 2006 General Election Registration and Turnout, by Plan A District | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Plan A | Registrants 2006 | | | Voters 2006 | | | Voter Turnout Rate 2006 | | |
| District | Total | SSN | % SSN | Total | SSN | % SSN | Total | SSN | Non-SSN |
| 1 | 2,954 | 243 | 8.2% | 1,378 | 82 | 6.0% | 46.6% | 33.7% | 47.8% |
| 2 | 2,079 | 306 | 14.7% | 968 | 125 | 12.9% | 46.6% | 40.8% | 47.5% |
| 3 | 1,289 | 342 | 26.5% | 542 | 140 | 25.8% | 42.0% | 40.9% | 42.4% |
| 4 | 1,104 | 469 | 42.5% | 376 | 152 | 40.4% | 34.1% | 32.4% | 35.3% |
| 5 | 1,387 | 367 | 26.5% | 601 | 148 | 24.6% | 43.3% | 40.3% | 44.4% |
| 6 | 1,301 | 376 | 28.9% | 472 | 134 | 28.4% | 36.3% | 35.6% | 36.5% |
| Unknown | 222 | 24 | 10.8% | 105 | 10 | 9.5% | 47.3% | 41.7% | 48.0% |
| Totals | 10,336 | 2,127 | 20.6% | 4,442 | 791 | 17.8% | 43.0% | 37.2% | 44.5% |

Source: File 12190676 furnished by Doug Colety at Skyline Political Consulting to Peter Morrison. Surnames coded against Census Bureau List of Spanish Surnames.

Table V-2 shows corresponding registration levels for each of the six districts of Dr. Beveridge's Plan A.  Clearly, Hispanics do not presently comprise a majority of the registered voters in District 4 (where they make up just 42.5% of all 1,104 registrants).  Nor do Hispanics comprise a majority of District 4 voters turning out (where they are 40.4% of all 376 voters turning out).  Indeed, Hispanics have *never* comprised a majority of District 4 voters turning out in any election since 1995 (see Table V-3).

**Table V-3**

| HISPANIC AND NON-HISPANIC VOTER TURNOUT IN PORT CHESTER VILLAGE AND GENERAL ELECTIONS: 1995 - 2006 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 G |
| **All voters village-wide** | | | | | | | | | | | | | |
| Voters turning out | 3,143 | 2,771 | 4,053 | 3,181 | 3,676 | [2000-03 data on request] | | | | 2,068 | 2,753 | 2,440 | 4,442 |
| Spanish surn. | 166 | 128 | 262 | 172 | 302 | | | | | 207 | 294 | 288 | 791 |
| Non-Spanish surn. | 2,977 | 2,643 | 3,791 | 3,009 | 3,374 | | | | | 1,861 | 2,459 | 2,152 | 3,651 |
| % Spanish surn. | 5.3% | 4.6% | 6.5% | 5.4% | 8.2% | | | | | 10.0% | 10.7% | 11.8% | 17.8% |
| **District 4 voters** | | | | | | | | | | | | | |
| Voters turning out | 258 | 199 | 323 | 256 | 301 | [2000-03 data on request] | | | | 153 | 208 | 181 | 376 |
| Spanish surn. | 28 | 22 | 45 | 34 | 57 | | | | | 37 | 44 | 51 | 152 |
| Non-Spanish surn. | 230 | 177 | 278 | 222 | 244 | | | | | 116 | 164 | 130 | 224 |
| % Spanish surn. | 10.9% | 11.1% | 13.9% | 13.3% | 18.9% | | | | | 24.2% | 21.2% | 28.2% | 40.4% |

Source: Voter history files furnished by Doug Colety at Skyline Political Consulting to Peter Morrison. Surnames coded against Census Bureau List of Spanish Surnames.

The absence of a Hispanic voting majority in Plaintiffs' District 4 results not from the structure of Port Chester's election system but from the confluence of demographic and socioeconomic factors (documented in Section III above) that diminish Hispanic electoral strength and participation. Symptomatic of their effects, Hispanic registrants within District 4 consistently vote at lower rates than do Hispanics villagewide.

In the most recent election (2006), Hispanic voters within District 4 turned out at a rate of 32.4 per 100 registrants (see Table V-2). By comparison, Hispanic voters in every other district turned out at a higher rate (typically around 40 per 100 registrants). Note that the *non-Hispanic* voters within District 4 also turned out at a lower rate (35.3 per 100 registrants) than did non-Hispanic voters in every other district.

The consistent disparity between turnout within vs. outside District 4—among both Hispanics and non-Hispanics—reflects the distinctive socioeconomic characteristics that predispose lower political participation by District 4 residents as a whole. By all indications, District 4 serves increasingly as an immigrant entry port, attracting newcomers (many of them noncitizens) who replace earlier generations moving on to other neighborhoods. Consistent with this view, Dr. Beveridge's estimates (Declaration Exhibit F) show the citizen voting-age population of District 4 declining from 1,362 in 2000 to 1,122 by 2006. Village-wide, the corresponding change was an increase, from 13,980 in 2000 to 14,259 by 2006.

## CANDIDATES' ORDER OF FINISH IN RECENT ELECTIONS

Vote dilution is the inability of a group to elect at-large candidates whom it could elect in single-member districts. Since vote dilution is a central issue here, I undertook a detailed analysis of how Hispanic candidates have fared in recent at-large elections and how they would have fared in Plaintiffs' proposed District 4 of Plan A. The specific question posed is: Can one identify Hispanic candidates who lost at large but could have been elected in District 4 of Plan A? If so, what difference would these additional victories make in Hispanics' ability to elect?

To answer this question, I compare each Hispanic candidate's order of finish at large (where there may be multiple elected positions to be filled, hence several winners) with that candidate's order of finish among just the voters within proposed District 4 (where only the single top vote getter would win). Of course, we cannot know who might reside (or run for election) in District 4.

As will be seen, carving up the political landscape to form one heavily Hispanic district does not necessarily confer an ability to elect there which did not exist at large. There are several reasons for this. First, such a district may not coincide with areas inhabited by Hispanics eligible to vote or inclined to register and turn out. Second, forming such a district may attenuate voting strength among the majority of Hispanic voters elsewhere in Port Chester, reducing their villagewide influence. That is, Hispanics in every other district may end up as a smaller voting bloc than they would be on a villagewide basis, weakening their prospects of determining the one (and only) winner in each of those other districts.

**Table V-4. How Hispanics' Candidates of Choice Fared in
Trustee and Mayoral Elections, 2000-2006**

| Election year | Hispanics' candidate(s) of choice | Actual outcome | Hypo. outcome (finish) in District 4 of Plan A |
|---|---|---|---|
| *Trustee* | | | |
| 2000 | Fulco (D) | Lost (3rd) | Lost (3rd) |
| | Mann (D) | Lost (4th) | Lost (4th) |
| 2001 | Ruiz (D) | Lost (4th) | Lost (2nd) |
| | DiRoberto (D) | Won (2nd) | Won (1st) |
| 2002 | Korff (D) | Lost (4th) | Lost (2nd) |
| | Saline (D) | Lost (3rd) | Won (1st) |
| 2003 | Grey (D) | Lost (3rd) | Lost (2nd) |
| | Saline (D) | Lost (4th) | Lost (4th) |
| 2004 | DiRoberto (D) | Lost (4th) | Lost (4th) |
| | Pilla (D) | Lost (3rd) | Won (1st) |
| 2005 | Grey (D) | Lost (3rd) | Won (1st) |
| | Capeci (D) | Lost (4th) | Lost (3rd) |
| 2006 | Pilla (D) | Won (1st) | Won (1st) |
| | Brakewood (D) | Won (2nd) | Lost (2nd) |
| *Mayoral* | | | |
| 2001 | Korff (D) | Lost | Won (1st) |
| 2003 | Capeci (D) | Lost | Won (1st) |
| 2005 | Cuddy (D) | Lost | Lost (2nd) |

1. <u>Port Chester Trustee and Mayoral Elections</u>

Dr. Handley analyzed six Trustee elections and three Mayoral elections. For each election, she attempted to identify the Hispanic voters' candidate of choice. In what follows, I shall compare how these ostensible candidates of choice fared in the aggregation of voting precincts (or portions thereof) which constitute Plaintiffs' District 4 (which would have a single winner).

Fourteen ostensible Hispanic candidates of choice have run for Village Trustee since 2000 (see Table V-4). Three (DiRoberti, Pilla, and Brakewood) were elected under the existing at-large system (shown as "won" under the "Actual outcome" column).

DiRoberti and Pila also won among the voters in District 4, whereas Brakewood finished second there. The 11 other Hispanic candidates of choice lost under the existing at-large system, and 8 of these 11 also lost among voters in District 4.

These outcomes (summarized in Table V-5) support a clear conclusion: Heavily Hispanic District 4 in most instances would *not* have conferred on Hispanics an ability to elect Trustee candidates of their choice.

Three ostensible Hispanic candidates of choice—all Democrats and none of Hispanic origin—have run for Village Mayor since 2000 (see Table V-4). All three lost, and one of these three (Cudy) lost as well among voters in District 4.

Combining the 14 Trustee and 3 Mayoral contestants above, I calculate that of 14 ostensible Hispanic candidates of choice who lost at-large, 9 also lost among voters in District 4. Overall, District 4 in most (9 of 14) instances would *not* have conferred on Hispanics an ability to elect candidates of their choice.

## 2. Other Elections Where a Minority Candidate Ran, 2000-2006

Dr. Handley also analyzed several other exogenous elections in which she attempted to identify the Hispanic voters' candidate of choice. Again, I compare how these ostensible candidates of choice fared in Plaintiffs' District 4 (see Table V-6). Of the 5 Hispanic candidates of choice, 3 won both at large and in District 4. Two others lost at large, and one of these two also finished second in District 4. Here again, District 4 fails to confer on Hispanics an ability to elect candidates of their choice in half of the exogenous elections that Handley chose to examine.

In conclusion, the observed outcomes of numerous elections underscore a key point: District 4 of Plan A does not present the Court with an effective means of proving relief. In most contests, District 4 would not have altered the outcome in a way that improved Hispanics' ability to elect. (Indeed, one of the candidates elected at large—Brakewood— would have lost had he run in District 4).

This demonstrable ineffectiveness of District 4 is but one consideration the Court can weigh. Another consideration to be weighed is what consequence would accompany the use of any plan incorporating District 4, to which I turn next.

### Table V-5. Hispanics Running for Trustee, 2000-2006, by Actual Outcome and Outcome Within District 4

|  | Elected by district | Defeated by district |
|---|---|---|
| No. elected at large: 3 | DiRoberto ('01) Pilla ('06) | Brakewood ('06) |
| No. defeated at large: 11 | Saline ('02) Pilla ('04) Grey ('05) | Fulco, Mann, Ruiz Korff, Grey, Saline DiRoberto, Capeci |
|  | No. elected by district: 5 | No. defeated by district: 9 |

### Table V-6. How Hispanics' Candidates of Choice Fared in Other Exogenous Elections

| Election | Hispanics' candidate of choice | Actual outcome | Hypo. outcome (finish) in District 4 of Plan A |
|---|---|---|---|
| 2000 Family Court Judge | Klein (D) (Morales) Horowitz (D) | won won | won (1st) won (2nd) |
| 2001 District Attorney | Castro (D) | lost | lost (2nd) |
| 2005 District Attorney | Castro (D) | lost | won (1st) |
| 2002 Attorney General | Spitzer (D) | won | won (1st) |

## VI.  CRITICAL EVALUATION OF PLAINTIFFS' PLAN A

In this section, I evaluate the consequences of using Professor Beveridge's Plan A with respect to traditional redistricting criteria for drawing a fair and balanced plan.  Table VI-1 shows the relevant parameters of Plan A as presented in Exhibit F of Prof. Beveridge's Declaration.  Figure VI-1 shows the portions of existing election precincts in Port Chester contained within each of the 6 districts in Plan A.

Professor Beveridge's stated aim was "… to determine whether Hispanic voters are sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Board of Trustees can be drawn in which they would constitute an effective majority in one or more of six districts." [Declaration at paragraph 4.]  His opinion is that "… a single-member districting plan can be created that includes one majority Hispanic district (District 4).  Such a plan *follows accepted districting principles*." [Declaration at paragraph 15, emphasis added.]

Several noteworthy features of Plan A bear directly on these principles.  First, the Plan's overall total population balance falls within acceptable limits (a 5.71% total deviation from ideal).  However, the resulting distribution of citizen voting-age population (CVAP) across the 6 districts is severely imbalanced, both in 2000 and in 2006.  District 4 in particular has only 1,362 CVAP, which is far less than one-sixth (2,330) of all 13,980 CVAP in Port Chester in 2000.  Conversely, D1 has 3,144 CVAP, which is far more than one-sixth (2,330).  The same extremes are evident as of 2006, according to Beveridge's estimates.

Second, Plan A splits up existing election precincts to an excessive degree (see Fig. VI-1).  This is especially apparent in District 4, which incorporates portions of 00 existing precincts.  It is necessary on occasion to allocate the population of a precinct to more than one district so as to make all districts roughly equipopulous.  In Plan A, however, Prof. Beveridge appears to have respected existing precinct boundaries only in those areas that are relatively devoid of Hispanics.

CONSEQUENCES OF USING PLAN A

Delineating the districts of a plan intended for actual use (as opposed to a hypothetical plan) entails balancing a number of legitimate districting criteria.  Among these criteria are: (1) avoiding extreme over- or under-valuing of votes cast by the citizens living in one or another district; (2) respecting existing political boundaries; and (3) respecting existing communities of interest.

In designing Plan A, Professor Beveridge clearly had one overriding and explicitly racial purpose in forming District 4: to try to show that one can form a district where Hispanics would constitute at least 50% of CVAP.  He failed to evaluate Plan A against other necessary redistricting criteria.  Because of this oversight, he failed to note that any plan incorporating District 4 would have several adverse consequences.

Table VI-1

| Exhibit F. — Table 3. Total Population and Composition of Report 6 District Single Member Plan, Census 2000 and Estimate 7/2006 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| District | Population | Deviation | % Deviation | Total Hispanic Orign | | Total Non-Hispanic White | | Total Non-Hispanic Black | | |
| 1 | 4,789 | -145 | -3.11% | 855 | 17.85% | 3,700 | 77.26% | 77 | 1.61% | |
| 2 | 4,592 | 53 | 1.13% | 1281 | 27.90% | 2,924 | 63.68% | 214 | 4.66% | |
| 3 | 4,793 | -149 | -3.20% | 2610 | 54.45% | 1,650 | 34.43% | 292 | 6.09% | |
| 4 | 4,574 | 71 | 1.52% | 3449 | 75.40% | 575 | 12.57% | 381 | 8.33% | |
| 5 | 4,528 | 117 | 2.51% | 2193 | 48.43% | 1,917 | 42.34% | 249 | 5.50% | |
| 6 | 4,591 | 54 | 1.15% | 2496 | 54.37% | 1,168 | 25.44% | 671 | 14.62% | |
| | 27,867 | | | 12884 | 46.23% | 11,934 | 42.82% | 1,884 | 6.76% | |

| District | Voting Age Population | | | Voting Age Hispanic Orign | | Voting Age Non-Hispanic White | | Voting Age Non-Hispanic Black | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3,667 | 76.57% | | 604 | 16.47% | 2,896 | 78.97% | 45 | 1.23% |
| 2 | 3,739 | 81.42% | | 913 | 24.42% | 2,526 | 67.56% | 163 | 4.36% |
| 3 | 3,710 | 77.40% | | 1,917 | 51.67% | 1,394 | 37.57% | 221 | 5.96% |
| 4 | 3,473 | 75.93% | | 2,564 | 73.83% | 486 | 13.99% | 313 | 9.01% |
| 5 | 3,575 | 78.95% | | 1,584 | 44.31% | 1,671 | 46.74% | 183 | 5.12% |
| 6 | 3,436 | 74.84% | | 1,780 | 51.80% | 1,018 | 29.63% | 452 | 13.15% |
| | 21,600 | 77.51% | | 9,362 | 43.34% | 9,991 | 46.25% | 1,377 | 6.38% |

| District | Voting Age Citizen Population | | | Voting Age Citzen Hispanic Orign | | Voting Age Non-Hispanic White | | Voting Age Citzen Non-Hispanic Black | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3,144 | 65.65% | | 267 | 8.49% | 2,688 | 85.50% | 68 | 2.17% |
| 2 | 2,964 | 64.55% | | 283 | 9.56% | 2,486 | 83.86% | 128 | 4.31% |
| 3 | 2,109 | 44.01% | | 632 | 29.95% | 1,153 | 54.69% | 274 | 12.98% |
| 4 | 1,362 | 29.78% | | 688 | 50.51% | 403 | 29.58% | 196 | 14.40% |
| 5 | 2,341 | 51.69% | | 609 | 26.00% | 1,437 | 61.38% | 135 | 5.75% |
| 6 | 2,060 | 44.88% | | 580 | 28.13% | 993 | 48.21% | 438 | 21.28% |
| | 13,980 | 50.17% | | 3,058 | 21.87% | 9,160 | 65.52% | 1,239 | 8.86% |

Estimate As of 7/2006

| District | Voting Age Citizen Population | | | Voting Age Citzen Hispanic Orign | | Voting Age Non-Hispanic White | | Voting Age Citzen Non-Hispanic Black | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3,199 | | | 329 | 10.27% | 2,685 | 83.93% | 67 | 2.09% |
| 2 | 3,055 | | | 597 | 19.55% | 2,280 | 74.65% | 114 | 3.73% |
| 3 | 2,234 | | | 816 | 36.52% | 1,125 | 50.35% | 253 | 11.34% |
| 4 | 1,122 | | | 688 | 61.33% | 278 | 24.78% | 108 | 9.62% |
| 5 | 2,583 | | | 871 | 33.71% | 1,388 | 53.74% | 160 | 6.18% |
| 6 | 2,066 | | | 628 | 30.38% | 946 | 45.82% | 433 | 20.95% |
| | 14,259 | | | 3,928 | 27.55% | 8,703 | 61.03% | 1,135 | 7.96% |

Figure VI-1



First, the predominant emphasis on forming one majority-Hispanic district relegates the remainder of Port Chester's population to five other districts which must be made to fit into such a plan irrespective of other legitimate traditional redistricting criteria. This predominant emphasis given to race causes the votes of citizens to carry unequal weight in different districts. Voting-age citizens who live in certain districts would see their votes grossly devalued, which amounts to a distinct disenfranchising effect. This effect would render the entire plan dysfunctional when judged against traditional redistricting criteria.

Second, such vote devaluation would systematically penalize existing communities of interest within Port Chester. Specifically affected would be: 00% of Black citizens of voting age in the Village, 00% of its Asian voting-age citizens, as well as most non-Hispanic whites.

Third, by "packing" noncitizens in the Hispanic concentration district to create a Hispanic majority in one of the six districts, Plaintiffs would "pack" Anglos into 00 districts, even though they have sufficient voting-age citizens to be the majority in all six districts. There is no basis, so far as I know, for maximizing the voting strength of one group at the expense of another group.

## DEVALUATION OF VOTES

Prof. Beveridge's focus on race produces an unnecessary consequence: It devalues the votes of the citizens who make up Port Chester's various communities of interest. The single-minded effort to maximize Hispanics in one district results in a grossly uneven distribution of voting-age citizens across all districts, thereby causing votes to carry unequal weight in different districts.

Plan A systematically pack noncitizens into District 4 in order to boost the district's total population to one-sixth of the village's total. Such packing has the effect of inflating the value of a vote in that district while deflating its value elsewhere in Port Chester. Overvaluing votes cast in District and undervaluing votes cast outside District 4 would penalize the majority of all voting-age citizens in Port Chester, who form various other communities of interest.[5]

To demonstrate this effect, I calculate the share of all current voting-age citizens in District 4 of Plan A, using the data shown in Beveridge's report. That share (1,362 of 13,980 CVAP, as shown in Table VI.1) is only 9.74%, far below the one-sixth (16.67%) that would correspond to a vote that carries equal weight among the citizens of each district.

---

[5] Among those communities of interest penalized would be ...

The problem posed by this overly narrow share of CVAP in the Hispanic concentration district is not inevitable, but it is inherent in the demography of Port Chester's population. By establishing District 4, Beveridge makes the votes of _individual_ electors within District 4 count for more than the votes of their counterparts elsewhere. In District 1, for example, the corresponding share (3,144 of 13,980 CVAP, as shown in Table X of his report) is 22.49%, far in excess of the one-sixth (16.67%) that would correspond to a vote that carried equal weight among the citizens of each district. Likewise in District 2, the corresponding share (2,964 of 13,980 CVAP) is 21.20%, also far in excess of 16.67%.

Establishing District 4, then, would have the effect of conferring 16.67% of the Trustees' political power upon a mere 9.74% of the Village's citizens living in D4. This is a "political premium"--a vote that counts for 171% of what it should (i.e., 16.67% divided by 9.74%). In effect, establishing District 4 means "one person-1.7 votes."

By contrast, the votes cast by each individual citizen in the five other districts (with the remaining 90.26% of CVAP) necessarily would be underweighted. That is, establishing District 4 would have the effect of conferring 83.33% (i.e., 100% minus 16.67%) of the Trustees' political power upon 90.26% of the CVAP outside the D4. This is a "political penalty"--a vote that counts for just 92% of what it should (i.e., 83.33% divided by 90.26%). In effect, establishing District 4 (and thereby requiring that five other districts to be formed from what is left) means "one person-0.9 votes."

This devaluation would be most extreme in Districts 1 and 2. In District 1, Beveridge's predominant emphasis on race has the effect of conferring 16.67% of the Trustees' political power on 22.49% of the village's citizens living in District 1. The political penalty here is a vote that counts for just 74% of what it should—in effect, "one person-0.7 votes."

When we divide the 74% penalty in District 1 by the 171% premium in District 4, it is apparent that those being penalized—non-Hispanic whites, Blacks, and Hispanics living in District 1 rather than District 4--are being penalized substantially. Their vote in District 1 would carry only 43% of the value of a vote cast in District 4. Overall, this penalty would disenfranchise many (over 00%) of the citizens of various races and ethnicities in Port Chester. Among those specifically disenfranchised would be: 00% of the city's Black citizens, 00% of its Asian citizens, and 00% of non-Hispanic whites. Many Hispanics would be disadvantaged as well.

OTHER CONSEQUENCES

Using District 1 has the further effect of packing Anglo (nonHispanic white) voting-age citizens into the remainder of the village where those five other districts must be formed. Insofar as one tolerates this effect, one allows Anglos' votes to be "wasted." That wastage occurs because the five other districts end up with far more Anglos than needed for them to elect a representative of their choice there. By my calculations, Anglos would constitute 00% of voting-age citizens in these remaining five districts (see Table

xx).  Were it not for this packing of Anglos into the other five districts, then, <u>Anglos</u> could be the majority in all six districts.

There is no basis, so far as I know, for maximizing the voting strength of one group at the expense of another group.  Whatever justification plaintiffs might offer for maximizing Hispanics' voting strength in one district at the expense of Anglos, that very same justification would apply to maximizing Anglos' voting strength in four districts at the expense of Hispanics.

# VIII.  CONCLUSIONS

1.      Demographic differences between Hispanic and white non-Hispanic populations in Port Chester result in comparatively lower levels of voter registration and turnout among Hispanics.  Hispanics comprise 46% of Port Chester's total population; however, they are only 22% of the population of citizens 18 and older who are eligible to vote. These disparities between Hispanics' numerical presence in the population and their inherent electoral strength are the product of demographic differences between two populations.

2.  Socioeconomic differences between Hispanics and non-Hispanics magnify these inherent disparities, blunting Hispanic registration and voter turnout in Port Chester.  The Hispanic adult population is heavily weighted with persons who are youthful, have completed fewer years of schooling, are less fluent in English, have immigrated only recently, and are members of households with lower incomes and short durations of residence.  Together, these factors predispose lower levels of registration and voter turnout by Hispanics than non-Hispanics.

3.  Hispanics do not constitute an effective majority in any district of Plaintiff's Plan A. Even if Hispanics are a bare majority of the citizen voting-age population any district, they are demonstrably far less than a majority among the *registered voters* of that district. This demonstrable fact means that Plaintiff cannot satisfy the Gingles first precondition.

4.  Plaintiff's Plan A violates traditional redistricting criteria for drawing a fair and balanced plan.  Its design manifests Plaintiff's predominant emphasis on race in order to form a district where Hispanics are the majority of voting-age citizens.  This predominant emphasis on race subordinates other legitimate traditional redistricting criteria, with consequences that render Plan A unfair and improper.

## IX.    REFERENCES

Abrahamse, A. F., P. A. Morrison, and N. M. Bolton. 1994. "Surname Analysis for Estimating Local Concentration of Hispanics and Asians," *Population Research and Policy Review* 13: pp. 383-398.

Arvizu, J. R. and F. C. Garcia. 1996. "Latino Voting Participation: Explaining and Differentiating Latino Voting Turnout," *Hispanic Journal of Behavioral Sciences* 18(2): pp. 104-128.

Avey, M. J. 1989. *The Demobilization of American Voters: A Comprehensive Theory of Voter Turnout* (New York: Greenwood).

Bass, L. E. and L. M. Casper. 2001. "Differences in Registering and Voting Between Native-born and Naturalized Americans," *Population Research and Policy Review* 20: pp. 483-511.

Brischetto, R. R. and R. O. de la Garza. 1983. *The Mexican American Electorate: Political Participation and Ideology.* San Antonio, TX: Southwest Voter Registration Education Project.

Calvo, A. A. and S. J. Rosenstone. 1989. *Hispanic Political Participation.* San Antonio, TX: Southwest Voter Research Institute.

Casper, L. M. and L. E. Bass. 1998. "Voting and Registration in the Election of November 1996," *Current Population Reports,* P20-504. Washington, DC: U.S. Census Bureau.

Clark, W. A. V. and P. A. Morrison. 1992. "Gauging Hispanic Voting Strength: Pitfalls and Paradoxes," *Population Research and Policy Review* 11: pp. 145-156.

Clark, W. A. V. and P. A. Morrison. 1995. "Demographic Foundations of Political Empowerment in Multi-Minority Cities," *Demography* 32(2): pp. 183-201.

Highton, B. 2000. "Residential Mobility, Community Mobility, and Electoral Participation," *Political Behavior* 22(2): pp. 109-120.

Jamieson, A., H. B. Shin, and J. Day. 2002. "Voting and Registration in the Election of November 2000," *Current Population Reports,* P20-542. Washington, DC: U.S. Census Bureau.

Leighley, J. E. and J. Nagler. 1992. "Individual and Systemic Influences on Turnout: Who Votes? 1984," *Journal of Politics* 54 (3): pp. 718-40.

Morrison, P. A. 1994. "Empowered or Disadvantaged? Applications of Demographic Analysis to Political Redistricting," chapter in H. Kintner et al., eds. *Demographics: A*

*Casebook for Business and Government* (Westview Press).

Morrison, P. A. 1998. "Demographic Influences on Latinos' Political Empowerment: Comparative Local Illustrations," *Population Research and Policy Review* 17: pp. 223-246.

Passel, J. S. and D. L. Word. 1980. "Constructing the List of Spanish Surnames for the 1980 Census: An Application of Bayes' Theorem," presented at the annual Population Association of America meetings, Denver, April 10-12.

Perkins, R. C. 1993. "Evaluating the Passel-Word Spanish Surname List: 1990 Decennial Census Post Enumeration Survey Results. U.S. Census Bureau, Population Division, Technical Working Paper No. 4.

Siegel, J. S. 2002. *Applied Demography* (San Diego: Academic Press).

Squire, P., R. E. Wolfinger, and D. Glass. 1987. "Residential Mobility and Voter Turnout," *American Political Science Review* 81(1): pp. 45-65.

Timpone, R. J. 1998. "Structure, Behavior, and Voter Turnout in the United States," *American Political Science Review* 92(1): pp. 145-158.

Uhlaner, C. J., B. E. Cain, and D. R. Kiewiet. 1989. "Political Participation of Ethnic Minorities in the 1990s," *Political Behavior* 11: pp. 195-231.

Verba , S. and N. Nie. 1972. *Participation in America: Political Democracy and Social Equality* (Chicago: University of Chicago Press).