No. 06 CV 15173 (SCR)

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT

---

UNITES STATES OF AMERICA,

Plaintiff,

v.

VILLAGE OF PORT CHESTER,

Defendant.

---

TRIAL IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

BRIEF OF AMICUS CURIAE

---

John W. Carroll
WOLFSON & CARROLL
233 Broadway - Suite 2200
New York, NY 10279
T: 212.233.0314
F: 212.349.4911



**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and Ninth Circuit Rule 26.1,
Amicus Curiae FairVote hereby states that it is a non-profit
corporation organized under the laws of the District of
Columbia. FairVote has no parent corporation, and no publicly
traded company owns 10 percent or more of the stock of
FairVote, given that FairVote issues no stock and thus has no
shareholders.

Dated: February 8, 2008

John W. Carroll NYSB# JC6810
WOLFSON & CARROLL
233 Broadway - Suite 2200
New York, NY 10279
T: 212.233.0314
F: 212.349.4911
Attorney for Amici Curiae
FairVote

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
UNITED STATES OF AMERICA          :
                                  :     BRIEF AMICUS CURIAE
            Plaintiff,            :
                                  :
      v.                          :
                                  :     06 CV 15173(SCR)
VILLAGE OF PORT CHESTER,          :     JUDGE ROBINSON
                                  :
            Defendant.           :
-----------------------------x


February 7, 2008

            _____  JC 6810
            John W. Carroll

TO:
Michael J. Garcia
United States Attorney for Southern District of New York
David J. Kennedy
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Attorneys for Plaintiff

Anthony G. Piscionere
Piscionere & Nemarow, P.C.
363 Boston Post Road
Rye, New York 10580
Attorney for Defendant

**TABLE OF CONTENTS**

<u>page</u>

TABLE OF CONTENTS ............................................i

TABLE OF AUTHORITIES ........................................ii

IDENTITY AND INTEREST OF THE AMICUS CURIAE....................1

SOURCE OF AUTHORITY OF AMICUS CURIAE TO FILE..................1

ARGUMENT .....................................................3

I.   **Background Information** .................................. 3

II.  **With Liability Now Determined, a Modified At-Large**
     **System is the Best Remedy.** ................................ 5

     A. Option A: Choice Voting Remedy. ........................6
        1. How It Works.....................................6
        2. Benefits.........................................7
        3. History of Use in New York and Beyond.............8
     B. Option B: Cumulative Voting Remedy. ..................12

III. **Department of Justice Support for Modified At-Large**
     **Systems** ...............................................14

IV.  **Conclusion** ...........................................17

Certificate of Compliance With Rule 32(a) ....................18

## TABLE OF AUTHORITIES

**Cases**

page

Cottier v. City of Martin, 475 F. Supp. 2d 932 (2007)............2

Holder v. Hall, 512 U.S. 874, 114 S.Ct. 2581 (1994).............10

Johnson v. City of New York, 274 N.Y. 411 (1937).................9

McSweeney v. City of Cambridge, 665 N.E.2d 11 (Mass.

    1996).......................................................7.

Strougo v. Scudder, Stevens & Clark, Inc., 1997 WL 473566

    (S.D.N.Y. Aug. 18, 1997) ........................................1

United States v. Gotti, 755 F. Supp. 1157, 1158 (E.D.N.Y.

    1991).......................................................1

Vulcan Society of New York City Fire Dep't, Inc. v.

    Service Comm'n, 490 F.2d 387 (2d Cir. 1973) ...................1

**Statutes**

NY CLS Educ Article § 2590-c(7) (1998)  .........................8

**Law Review Articles**

Robert R. Brischetto & Richard L. Engstrom, Cumulative

    Voting and Latino Representation: Exit Surveys in

    Fifteen Different Texas Communities, 78 Soc. Sci. Q.

    973, 974 (1997) ........................................12

Richard Briffault, Book Review: Lani Guinier and the
Dilemmas of American Democracy, 95 Colum. L. Rev. 418
(1995) ...................................................11

Richard L. Engstrom, Modified Multi-Seat Election
Systems as Remedies for Minority Vote Dilution, 21
Stetson L. Rev. 743, 751 (1992)............................6

Richard L. Engstrom, The Single Transferable Vote: An
Alternative Remedy for Minority Vote Dilution, 27
U.S.F.L. Rev. 781 (1993) ..................................7

Steven J. Mulroy, Alternative Ways Out: A Remedial
Roadmap for the Use of Alternative Electoral Systems
as VRA Remedies, 77 N.C. L. 1867 (1999) ..................7,9

Steven J. Mulroy, The Way Out: A Legal Standard for
Imposing Alternative Electoral Systems as Voting
Rights Remedies, 33 Harv. C.R.-C.L. L. Rev. 333 (1998)...5,6,9,11,12

Richard H. Pildes and Kristen A. Donoghue, Cumulative
Voting in the United States, 1995 U. Chi. Leg. Forum
241 (1995) ..............................................11,12

**Other Sources**

Douglas Amy, The Forgotten History of the Single
Transferable Vote in the United States, 1
Representation 34 (1996). .................................8

Anita Hodgkiss (Deputy Assistant Attorney General in the
    Civil Rights Division at the Department of Justice),
    Testimony Concerning H.R. 1173, U.S. House of
    Representatives Committee on the Judiciary, Subcomm.
    on the Constitution (Sept. 23, 1999) ........................13

Bill Lann Lee, Letter from DOJ to Eric Proshansky,
    Assistant Corporation Counsel, New York City (Feb. 4,
    1999) ......................................................9

Rob Richie, Letter to DOJ Re: Submission Number 98-31-93,
    (Oct. 14, 1998) ............................................8

George H. McCaffrey, Municipal Affairs: Proportional
    Representation in New York City, 33 Am. Pol. Sci.
    Rev. 841 (1939). ..........................................9

National Civic League, Model City Charter, (National
    Civic League Press, 8th 3d. 2003) ........................6,8,10

The News Journal, Port Chester to Pitch Cumulative voting
    (Jan. 28, 2008), available at:
    http://www.lohud.com/apps/pbcs.dll/article?AID=/200812
    8/NEWS02/801280407/1026/NEWS10 ...............................3

## IDENTITY AND INTEREST OF AMICUS CURIAE

FairVote is a national 501(c)(3) non-profit organization incorporated in the District of Columbia, whose mission is to advocate for fair representation through voting systems changes. FairVote files this brief to ensure consideration of the availability and legality of two potential modified at-large systems as remedies, now that this court finds the Village of Port Chester, New York to be in violation of Section 2 of the VRA.

## SOURCE OF AUTHORITY OF AMICUS CURIAE TO FILE

"Federal courts have discretion to permit participation of amici where such participation will not prejudice any party and may be of assistance to the court." Strougo v. Scudder, Stevens & Clark, Inc., 1997 WL 473566 (S.D.N.Y. Aug. 18, 1997) (citing Vulcan Society of New York City Fire Dep't, Inc. v. Civil Service Comm'n, 490 F.2d 387, 391 (2d Cir. 1973)); United States v. Gotti, 755 F.Supp. 1157, 1158 (E.D.N.Y 1991) (amici may "provide supplementary assistance to existing counsel and insur[e] a complete and plenary presentation of difficult issues so that the court may reach a proper decision").

## SUMMARY OF THE ARGUMENT

Modifying an at-large system to provide for choice voting (also known as the "single transferable vote" or "STV") or cumulative voting can often meet the goals of fair representation better than alternative remedies. Choice voting has a substantial history of use in New York State, including winning support from the Department of Justice and approval from the New York State Supreme Court, and is particularly strong as a remedy if there is potential for racial minorities to run more than one candidates. Cumulative voting has been adopted in dozens of communities throughout the United States as a result of consent decrees in Voting Rights Act (hereinafter "VRA") litigation and was imposed in Martin, South Dakota in 2007. Cottier v. City of Martin, 475 F. Supp. 2d 932 (2007). These systems have a track record of serving as effective remedies to minority vote dilution. No federal Court of Appeals has held that a choice voting or cumulative voting consent decree is per se unlawful, and in an opinion signed by two current members of the Supreme Court, choice voting and cumulative voting are cited specifically as remedies that could be imposed by a federal court. Holder v. Hall, 512 U.S. 874 (1994).

At the same time, choice voting and cumulative voting avoid the necessity for deliberately drawing districts along racial lines, with the attendant problems that can cause. As a result, a geographically dispersed minority group may be able to gain representation otherwise unavailable through district-based systems.

This court and the parties to this litigation should give consideration to these two modified at-large voting systems, now that this court has found the defendants liable for violations of Section 2 of the VRA.

## ARGUMENT

### I.    Background Information

The Village of Port Chester is located in the state of New York and has a population of 27,867. (Comp. ¶6.) The Village is governed by a Board of Trustees comprised of six Trustees and the Mayor. (Comp. ¶9.) Although forty-six point two percent (46.2%) of the population is Hispanic (Comp. ¶6.), and twenty-one point nine percent (21.9%) of the citizen voting age population is Hispanic (Comp. ¶8.), the Village has never elected a Hispanic person to the Board of Trustees. (Comp. ¶13.) Plaintiffs seek representation through this litigation, with a proposed remedy being single member

districts. The plaintiffs' remedy would leave approximately two-thirds of Port Chester's Latino community in white-majority districts and require the Village to establish a primary system and engage in districting after each Census. The defendant Village of Port Chester has indicated it will propose a modified at-large voting system. (The News Journal, *Port Chester to Pitch Cumulative Voting* (Jan. 28, 2008), *available at* http://www.lohud.com/apps/pbcs.dll/article?AID=/20080128/NEWS02/801280407/1026/NEWS10). Notably, both choice voting and cumulative voting would help mitigate any geographic dispersion of the Hispanic community in Port Chester and choice voting would not require the Village to establish a primary system or engage in districting.

The election system currently in use is an at-large, winner-take-all system with staggered voting that holds elections for two Trustee positions per year. (Comp. ¶18.) FairVote believes that such voting systems hold great potential to dilute the voting strength of communities of color. In finding the Village of Port Chester liable for a VRA Section 2 violation, this court agrees.

Nevertheless, it is the winner-take-all aspect of these elections that causes vote dilution, rather than anything intrinsic to the at-large component of the elections. In fact,

there are numerous ways of modifying at-large systems to prevent vote dilution, such as replacing the winner-take-all feature with choice voting or cumulative voting tabulation rules. Each of these systems, for reasons described herein, would be effective at providing Port Chester's Hispanic community a fair opportunity for representation in their local government. They also have some notable benefits over single-member district systems.

## II.  With Liability Now Determined, a Modified At-Large System is the Best Remedy

Modified at-large election systems are often a preferable choice for jurisdictions, because they can represent diverse and geographically dispersed groups within a community without a need to create districts. Although single member districts have been the most common remedy in vote dilution cases, modified at-large systems are legitimate alternative remedies -- in spite of some judges' confusion stemming from the coincidental fact that these systems are sometimes called "proportional representation" systems. Unlike quotas, these modified at-large systems fully comply with the Voting Rights Act because they have been proven to provide fair opportunities to liked-minded minorities without employing any

kind of racial quota. Steven J. Mulroy, <u>The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies</u>, 33 Harv. C.R.-C.L. L. Rev. 333, 349 (1998) (cataloging the success of cumulative voting in elections in Illinois, New Mexico, South Dakota, and Alabama for a variety of racial groups). These systems also comply with constitutional guarantees of equal protection.

## A. Option A: Choice Voting Remedy

### 1. How It Works

A modified at-large election system with a rich history in the United States in general, and New York in particular, is choice voting (also known as "the single transferable vote," "preference voting" or "the Hare system of proportional voting"). Choice voting allows voters to rank candidates in order of preference and like-minded groupings of voters (as defined by the way they vote) to elect candidates in proportion to their share of the vote. For decades it was the recommended voting method for cities in the *Model City Charter* of the National Municipal League (now the National Civic League) and has been used since 1941 for local elections in Cambridge, Massachusetts. National Civic League, <u>Model City Charter</u>, (National Civic League Press, 8th 3d. 2003).

In a choice voting election for a six-seat council,
candidates need to reach a "threshold" of one vote more than
one seventh of the total votes cast to win.[1] Votes are counted
in a series of rounds. In the initial round, candidates whose
first place rankings exceed a certain "threshold" are elected.
The portion of each winner's votes that exceeds the threshold
is then redistributed to remaining candidates based on voters'
second choices. When no candidate has met the threshold, the
candidate with the fewest votes is eliminated, and his ballots
are redistributed to the other candidates. This process of
redistribution and elimination is repeated in subsequent
rounds until all seats are filled. Mulroy, The Way Out, supra
at 349.


   **2. Benefits**

In jurisdictions in which it has been employed, choice voting
has been successful in providing fair representation for
minorities, including jurisdictions like Port Chester where
more than one racial minority group may contest seats and may
run more than one candidate in efforts to win more than one

---

[1] This threshold is calculated as: (number of votes cast) / [(number of
seats to fill) + (1)]. See Mulroy, 33 Harv. C.R.-C.L. L. Rev. at 342 &
nn.42-43, for a more complete explanation of choice voting and a
collection of references on specific counting procedures. See also,
Richard L. Engstrom, Modified Multi-Seat Election Systems as Remedies
for Minority Vote Dilution, 21 Stetson L. Rev. 743, 766 (1992).
(providing an illustrative diagram of choice voting).

seat. See Steven J. Mulroy, <u>Alternative Ways Out: A Remedial</u>
<u>Road Map for the Use of Alternative Electoral Systems as</u>
<u>Voting Rights Act Remedies</u>, 77 N.C. L. Rev. 1867, 1878-79 &
n.61. See also <u>McSweeney v. City of Cambridge</u>, 665 N.E.2d 11,
15 (Mass. 1996) (noting that choice voting "seeks more
accurately… to provide for the representation of minority
groups") (internal quotations omitted). Choice voting's vote
redistribution scheme protects against intra-group competition
splitting the minority vote. As highlighted by voting systems
expert Richard Engstrom's 1993 law review article, choice
voting will not only provide an electorally cohesive minority
with opportunities to elect candidates of its choice
comparable to these other systems, it will accommodate
electoral competition within the minority. Under choice
voting, such competition can be encouraged, while the
opportunity to elect minority candidates of choice still
remains viable. Richard L. Engstrom, <u>The Single Transferable</u>
<u>Vote: An Alternative Remedy for Minority Vote Dilution</u>, 27
U.S.F.L. Rev. 781 (1993).

### 3. History of Use in New York and Beyond

After being instituted by a law passed by the New York
state legislature, choice voting was in use for New York

City's 32 community school board elections until those elections ended in 2003. NY CLS Educ Article § 2590-c(7) (1998). When in place, the school boards were the most racially diverse elected bodies in New York City. Latinos candidates won at least two seats in 12 of 32 districts, won seats in proportion to their voting-age population in 18 districts and were only one seat shy of proportionality in 12 of the remaining 14 districts. Asian Americans and African Americans even more overwhelmingly earned representative shares of seats. Rob Richie, Letter to DOJ Re: Submission Number 98-31-93, (Oct. 14, 1998).

Given its well-tested history in allowing communities of color, including African Americans, Asian Americans and Latinos, to elect their candidates of choice in school boards across the three boroughs covered by Section Five of the Voting Rights Act, the Department of Justice refused to pre-clear a change to a less representative system in 1999. The denial of pre-clearance specifically noted: "the information we have indicates that the degree of racial bloc voting in Community School Board elections, in the covered counties and throughout the city, is such that the ability of minority voters to elect their candidates of choice will be considerably reduced under the submitted change in voting method. Under the existing STV system, minority voters need to

9

constitute approximately 10 percent of the voting population in order to elect their candidate of choice." Bill Lann Lee, Letter from DOJ to Eric Proshansky, Assistant Corporation Counsel, New York City (Feb. 4, 1999).

Choice voting has historically been used in a number of other jurisdictions, including five elections to the New York City Council from 1936 to 1945 (after landslide approval by the voters in 1936, in a campaign backed strongly by such contemporary leaders as Fiorello LaGuardia), Long Beach and Yonkers. Douglas Amy, The Forgotten History of the Single Transferable Vote in the United States, 1 Representation 34 (1996). The Greater New York charter commissions of 1900, 1907, and 1923 supported use of choice voting. George H. McCaffrey, Municipal Affairs: Proportional Representation in New York City, 33 Am. Pol. Sci. Rev. 841 (1939).

Outside of New York, it was used in such cities as Cincinnati and Cleveland, where one outcome repealed was a growth in representation of racial minorities. Steven J. Mulroy, Alternative Ways Out: A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies, 77 N.C. L. Rev. 1867, 1878-79 & n.61.

The New York Court of Appeals upheld the use of choice voting (known then as the "Hare system of proportional

voting") for city council elections as constitutional under the New York Constitution, stating: "We must always be careful in approaching a constitutional question dealing with principles of government, not to be influenced by old and familiar habits, or permit custom to warp our judgment. We must not shudder every time a change is proposed… At least this Hare system of proportional voting is an attempt to make representative government a reality." Johnson v. City of New York, 274 N.Y. 411 at 413 (1937). These words, though written long ago, ring true today in Port Chester.

In an opinion joined by Justice Antonin Scalia, United States Supreme Court Justice Clarence Thomas also gave favorable treatment to both choice voting and cumulative voting as race-neutral means of achieving compliance with the Voting Rights Act: "The decision to rely on single-member geographic districts as a mechanism for conducting elections is merely a political choice -- and one that we might reconsider in the future.... Already, some advocates have criticized the current strategy of creating majority-minority districts and have urged the option of other voting mechanisms -- for example, cumulative voting or a system using transferable votes [e.g., preference voting] -- that can produce proportional results without requiring division of the

11

electorate into racially segregated districts." Holder v.
Hall, 512 U.S. 874, 917 (1994) (Thomas, J., concurring).

Choice voting is currently used at the national level in
several countries, including Ireland and Australia, and had
been adopted for all local elections in Scotland, where it was
used for the first time in 2007. Choice voting is also listed
as an effective option for city governments in the National
Civic League's Model City Charter. National Civic League,
Model City Charter, (National Civic League Press, 8th ed.
2003). The system is currently used in school board and city
council elections in Cambridge, Massachusetts, and was adopted
by voters to elect certain bodies in Minneapolis, Minnesota,
starting in 2009.

**B. Option B: Cumulative Voting Remedy**

Cumulative voting is another type of modified at-large
voting that helps to ensure that minorities' interests are
represented. In a cumulative voting system, each voter is
given as many votes as there are positions to fill (for
example, if there are six seats on the city council, each
voter would have six votes). Each voter is then able to
allocate their votes among candidates as they see fit,
including giving all six votes to one candidate ("plumping")

or one vote each to six candidates. The candidates with the highest number of votes win, but a minority of voters, by "plumping" their votes onto one candidate, may earn a fair share of representation. See Richard H. Pildes and Kristen A. Donoghue, Cumulative Voting in the United States, 1995 U. Chi. Leg. Forum 241, 272 (describing how cumulative voting in Chilton County, Alabama "has worked just as predicted ex ante with respect to enhancing black representation even in the face of racially polarized voting"); Steven J. Mulroy, The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies, 33 Harv. C.R.-C.L. L. Rev. 333, 349 (1998) (cataloging the success of cumulative voting in elections in Illinois, New Mexico, South Dakota, and Alabama for a variety of racial groups).

As discussed in our prior brief to this court, cumulative voting increases the opportunity of minority groups to gain representation in government, regardless of where they live. See Richard Briffault, Book Review: Lani Guinier and the Dilemmas of American Democracy, 95 Colum. L. Rev. 418 (1995). By giving voters as many votes as seats to be filled, and allowing them to cast those votes behind one or several candidates, a community of color can gain representation.

Cumulative voting thus allows at-large elections to be
conducted without their traditional winner-take-all
disadvantages. This attribute of cumulative voting is hardly
speculative; jurisdictions employing cumulative voting have
seen exactly the predicted results. See Richard H. Pildes and
Kristen A. Donoghue, Cumulative Voting in the United States,
1995 U. Chi. Leg. Forum 241, 272 (describing how cumulative
voting in Chilton County Alabama "has worked just as predicted
ex ante with respect to enhancing black representation even in
the face of racially polarized voting"); Mulroy, 33 Harv.
C.R.-C.L. L. Rev. at 349 (cataloging the success of cumulative
voting in local elections in Illinois, New Mexico, South
Dakota, and Alabama for a variety of racial groups). As
previously noted, this voting system has been given
considerable treatment by federal courts.

### III. **Department of Justice Support for Modified At-Large Systems**

The United States Department of Justice ("DOJ") has a
history of supporting modified at-large systems in Voting
Rights Act cases. The U.S. Department of Justice has
frequently been directly or indirectly supportive of modified
at-large systems. It has precleared dozens of consent decrees
where jurisdictions have agreed to use cumulative voting or

limited voting, entered into one consent directly with Anson
(NC) to use a modified at-large system called limited voting
When a federal district court judge sought to impose a
cumulative voting plan in McCoy v. Chicago Heights, the DOJ
submitted an amicus brief supporting cumulative voting. McCoy
v. Chicago Heights, 6 F. Supp. 2d 973 (1998).

    The DOJ testified in favor of federal legislation to
allow use of choice voting and cumulative voting for
Congressional elections. They noted the value of minority
representation provided by the systems, as well as their
refusal to pre-clear such changes only once - when New York
City attempted to replace choice voting with a less
proportional system:

"These systems would replace the traditional 'winner-take-
all' method of vote counting with other means, such as
cumulative voting, limited voting, and preference voting (also
referred to as a single transferable vote system). These
methods are designed to allow fuller expression of the votes
of cohesive numerical minorities of every kind, whether racial
or otherwise....

"The experience with multi-member districts using
cumulative, limited or preference voting for local governing
bodies such as school boards or county commissions has been
that where a court is evaluating multi-member districts as
remedies for vote dilution, it is important to examine

carefully whether the limited voting, cumulative voting, or single transferable vote system will provide minority voters an equal opportunity to elect candidates of their choice. Studies of the outcomes of cumulative voting elections adopted by jurisdictions around the country to resolve Voting Rights Act claims reveal that they have been effective in removing barriers to electoral participation....

"Since 1980, the Civil Rights Division has received and evaluated more than 50 submissions of cumulative voting systems and approximately 13 of limited voting systems. Most were precleared. The Division has interposed an objection only once to a limited voting system: in 1997 the state of New York passed legislation that would have changed the method of election for members of New York City school boards from the single transferable voting system (STV) to limited voting. We concluded that a change from STV to limited voting would make minority voters in the covered counties in NYC worse off." Anita Hodgkiss (Deputy Assistant Attorney General in the Civil Rights Division at the Department of Justice), Testimony Concerning H.R. 1173, U.S. House of Representatives Committee on the Judiciary, Subcomm. on the Constitution (Sept. 23, 1999).

## IV.   Conclusion

Choice voting and cumulative voting would allow the Hispanic voters of the Village of Port Chester to gain representation on the city's board if the elections for Trustees were unstaggered. At present, each Trustee serves a three-year term and two Trustees are elected each year. (Comp. ¶9.) If only two seats are being voted on each year, the threshold of inclusion, i.e. the minimum percentage of the minority voters needed to gain one seat, would be thirty-three point four percent (33.4%). Because only twenty-one point nine percent (21.9%) of the citizen voting age population is Hispanic, (Comp. ¶8.), maintaining the system in this staggered fashion would likely result in an inability of the Hispanic population to elect any representatives. If the elections become unstaggered and all six trustees were up for a vote every three years, the threshold of inclusion would be only fourteen point three percent (14.3%) and the Hispanic community would be likely to elect a representative and well-positioned to compete for two seats.

## Federal Rules of Appellate Procedure Form 6. Certificate of Compliance

## With Rule 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of

   Fed. R. App. P. 32(a)(7)(B) because:

   ☒     this brief uses a monospaced typeface and contains

         355 lines of text, excluding the parts of the brief

         exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of

   Fed. R. App. P. 32(a)(5) and the type style requirements

   of Fed. R. App. P. 32(a)(6) because:

   ☒     this brief has been prepared in a monospaced

         typeface using Microsoft Word 2000 with Courier

         font at 10.5 characters per inch.


_____
John W. Carroll

JC6810

February 7, 2008

18